# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**CHARLES PAUL HARMAN,**

      **Plaintiff,**

**v.**                                     **Case No.  8:09-cv-1205-T-30EAJ**

**DAVID GEE, in his official capacity as the
Sheriff of the Hillsborough County Sheriff's
Office, et al.,**

      **Defendants.**
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant Francis Losat's Motion for Summary Judgment (Dkt. 22), Defendant David Gee's Motion for Summary Judgment (Dkt. 26), and Plaintiff Charles Harman's Response in opposition to the motions (Dkt. 34).  The Court, having considered the motions, response, and being otherwise advised in the premises, concludes that the motions should be granted.

### Background

Plaintiff Charles Harman brings this action against Defendants alleging a deprivation of constitutional rights.  Specifically Harman alleges claims for false arrest, malicious prosecution, and violations of 42 U.S.C. § 1983.  These claims arise out of the Harman's arrest for the murder of his wife, Emily Harman, in the spring of 2005.

At 3:51 a.m. on April 4, 2005, Harman called 911 to report the death of his wife. Harman told the dispatcher that Emily Harman committed suicide in their home by shooting herself in the mouth. Moments after the 911 call, deputies from the Hillsborough County Sheriff's Office ("HCSO") arrived on the scene. Francis Losat, a Detective with the HCSO Homicide Unit, was assigned as the lead investigator for the incident. He arrived at Harman's home at about 5:20 a.m.

Upon arrival, Losat spoke briefly with other deputies on the scene, who informed Losat that Harman had called 911 and reported that his wife shot herself. Losat then conducted a cursory walk through of the residence. During the walk through, Losat observed Harman seated inside the residence and the body of Emily Harman on the couch. Losat noted that Harman "did not look emotional and his face did not appear red and puffy as if he had been upset." (Dkt. 39-3, p. 2). Losat also noted that Emily Harman "was fully dressed, to include socks and black shoes." (Id.)

At approximately 5:50 a.m., Losat asked to speak to Harman. Harman agreed and Losat proceeded to interview Harman inside of his unmarked police car. This unrecorded interview lasted until about 8:00 a.m., with two short breaks for Losat to attend to phone calls. During the interview, Harman gave Losat background information about himself and his wife and discussed the events leading up the shooting. In his August 25, 2005, deposition in the criminal matter, Losat testified that by the end of this initial interview he did not believe that Emily Harman shot herself. (Dkt. 24-1, p. 44, lines 11-21).

At approximately 8:30 a.m., Losat commenced a second, recorded interview with Harman.  At the beginning of this interview, Losat had Harman sign a consent to interview form after reading him Miranda warnings.  The two again proceeded to discuss the events leading up to the shooting.

Harman stated that after work on April 3, 2005, he took his wife and two year old stepson to the beach for a couple of hours and then to dinner.[1]  They arrived at home around 9:30 p.m.  After taking a bath and getting ready for bed, Emily Harman and her son sat in the living room to watch a movie.  Harman was sitting at the computer, which was located near the living room.  Emily Harman was sitting on the loveseat paying bills.

At some point, Emily Harman began asking Harman about some of the charges on his online debit card statement.  Specifically, she asked about a charge for a Renaissance Fair and a charge for a meal at Ruby Tuesday.  Harman told her that he went to the Renaissance Fair with his friend and former girlfriend Stephanie Lloyd[2] and then took her out to lunch or dinner at Ruby Tuesday.  Harman stated that his wife did not care for Lloyd and that she was jealous of his relationship with Lloyd.  Emily Harman began crying and yelling at Harman and accusing him of cheating on her.  During this time, Harman got up and went to the back bedroom.  Emily Harman followed him there.  After some unknown time in the bedroom, both came back to the living room, where Harman's stepson was still watching the movie.

---

[1]  The events of that evening as described herein are all taken from the transcript of Losat's recorded interview of Harman on the morning of April 4, 2005, unless otherwise noted.

[2]  Harman dated and had a sexual relationship with Lloyd from January 2004 through October 2004.  (Dkt. 22-12).

While they were all in the living room, an argument ensued during which Emily Harman continued to accuse Harman of cheating on her and told Harman their marriage was a joke. Emily Harman complained that Harman was not excited about her pregnancy. At this point in the interview, Harman told Losat that he and his first wife had a daughter who had several heart conditions as a baby. After about two and a half years, she died in the hospital, with Harman at her bedside. Harman stated that during their argument, Emily Harman told him that she hoped he would have to go through that again.

Emily Harman also questioned his sexuality or accused him of being homosexual. During later proceedings and discovery, it was revealed that Harman is bisexual. Harman asked not to discuss his sexuality on tape at the time of the interview due to the potential violations of "Don't Ask, Don't Tell" policy. He believed this potential violation may have caused him to be discharged from the military, where he worked as an air traffic controller at the time.

At some point while the argument was going on, Harman went to the bedroom to take a break from the argument. While Harmon was in the bedroom, his wife went into the bathroom. He stated that he thought he heard her vomiting. When he went to check on her, she pushed him away. Harman was still in the bedroom when Emily Harman came out of the bathroom.

Harman later went out toward the living room and found Emily Harman holding his gun in a downward facing position. Harman had purchased the gun about a month earlier at a gun show. Though he was not trained to use the gun, he had practiced with it at a

shooting range.  Emily Harman had not practiced with the gun at a shooting range but Harman had explained to her how to use it.  He told her that the gun was kept loaded, with eight rounds in the magazine and one round in the chamber.  All she would have to do to use the gun is turn off the safety and pull the trigger.  He also had told her to always treat the gun as if it were loaded, whether or not it actually was loaded.

When Harman saw her holding the gun, he asked if she wanted him to call the police or if there was anybody he could call for her.  She told him not to call anybody.  Harman continued talking to Emily Harman, trying to calm her.  She moved around and ended up sitting in the loveseat.  Harman was also moving around and ended up sitting on the coffee table facing Emily Harman where she was sitting.

As they sat talking, Emily Harman was toying with the gun.  Harman told Losat that he thought she was very distraught and seemed suicidal.  Emily Harman began to get upset again.  She again brought up the cheating issues and the issues relating to Harman's sexuality, while holding the gun in her lap.  They continued arguing.  She told Harman that she did not want to be a single mother with two children from two different dads.  She then moved the gun into her mouth.  Harman continued talking to her in a continued attempt to calm her.  But she became more distraught.

Harman believed that she had made the decision to kill herself.  So he moved toward her and attempted to take the gun away from her.  Harman grabbed the gun and her hand with both of his hands.  She was holding the gun with her right hand only.  Harman placed his knee on the couch to balance himself.  Both of their hands began to slip but the gun came out

of her mouth.  They struggled over the gun for some undetermined amount of time.  During

this struggle, Emily Harman continued yelling.  She told Harman not to stop her and that

made Harman feel like she did not want him anymore.

The gun eventually went back into Emily Harman's mouth.  Harman explained the

next events to Losat:

| | |
|---|---|
| Losat: | The gun's out of her mouth.  Well, at that point the gun's out of her mouth. |
| Harman: | Yes, sir. |
| Losat: | Your hand's around the gun. |
| Harman: | Yes, sir. |
| Losat: | Okay.  She's still on... sitting on the loveseat with her back sitting down.  What do you do with the gun, Charles? |
| Harman: | We're both struggling...uh...like I said her hand...hands are slipping but...uh...the gun got close to her face again... |
| Losat: | And what did you do, Charles? |
| Harman: | She said I love you...like...like an accusation and it caught me...it really caught me off-guard and...uh... |
| Losat: | Tell me, Charles. You told me earlier the gun went in her mouth and you pulled the trigger. |
| Harman: | I think...when we shifted forward and... helped the gun go into her mouth...I believe she also moved her... her head towards the gun...(sighs)... and the trigger was squeezed and it went off. |
| Losat: | How many times did you pull it? |
| Harman: | The gun only went off once. |
| Losat: | What did you do with the gun after that? |
| Harman: | It dropped. |
| Losat: | You let go of it? |
| Harman: | Yes, sir.  Uh...as soon as it...as soon as I heard the report, my hands just... |

(Dkt. 22-8, p. 23).  After the shot went off, Harman called 911.  While he was on the phone

with the dispatcher, he washed the blood off of his hands.

This second interview of Harman concluded at about 9:10 a.m. During this interview, Harman never stated that Emily Harman pulled the trigger on the gun nor did he deny that he pulled the trigger. However, Harman also never affirmatively stated that he did pull the trigger.

At about 9:40 a.m. on April 4, 2010, HCSO deputies obtained Harman's criminal history report.[3] After receiving the criminal history report, Losat met with other HCSO personnel, including his supervisor Sergeant Mike Willette. Losat and Willette then conferred with Assistant State Attorney Jalal Harb and Terry Delisle, an investigator with the State Attorney's Office. Prior to this meeting, each person had observed the scene of the shooting and each had listened to portions of the recorded interview. (Dkts. 22-9 and 22-10). They discussed the investigation and the information they had obtained by that time and all concurred that there was sufficient probable cause to arrest Harman for the murder of Emily Harman. Harman was arrested, without a warrant, for second degree murder at about 12:00 p.m. on April 4, 2005.

On or around April 5, 2005, Florida state court Judge Walter Heinrich found probable cause to hold Harman on the second degree murder charge. (Dkt. 22-6). On April 12, 2005, the State filed an Information against plaintiff, charging him with second degree murder. Harman remained in custody from April 4, 2005 to about June 8, 2005, when he was released

---

[3] The criminal history report was not provided to the Court for review. Defendants assert that the report consisted of a 2003 arrest for Aggravated Assault with a Weapon and Battery, stemming from an argument between Harman and his first wife. The charges were apparently dismissed after Harman completed a diversionary program.

on bond.  On April 27, 2006, the Information was *nolle prossed* by the State Attorney's Office.

### Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)(emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.*  Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in his or her favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *Chelates*, 477 U.S. at 324.  The evidence must be significantly probative to support the claims. *Anderson*,  477 U.S. at 248-49.  This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v.*

*Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a question for the fact finder. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## Discussion

In his complaint, Harman alleges state law claims for false arrest and imprisonment (Counts One and Two) and malicious prosecution (Counts Three and Four) against each of the defendants. He also alleges a claim against each defendant for violations of 42 U.S.C. § 1983.

## I.     Harman's Claims under 42 U.S.C. § 1983

The defense of qualified immunity protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly

incompetent or one who is knowingly violating the federal law." *Id.* (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.2002)).  To be eligible for qualified immunity, the official must first establish that he was acting within his discretionary authority at the time of the alleged violation.  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. Ga. 2002).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id. (citing Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).  The Supreme Court has established a two-part test to determine the applicability of qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003).  First, the Court must determine whether the Plaintiff has suffered the deprivation of a constitutional right. *Id.*  The second step in the analysis is to determine whether Plaintiff's right was "clearly established" at the time the alleged violation occurred. *Id.*  In making these determinations, the government official's conduct is evaluated under an "objective legal reasonableness" standard. *Koch v. Rugg*, 221 F.3d 1283, 1295 (11th Cir. 2000) (citations omitted).  Importantly, the official's subjective intent is irrelevant to the inquiry. *Id.*

A.     **§ 1983 Claim Against Losat**

In Count Six, Harman alleges Losat also violated 42 U.S.C. § 1983, by arresting and incarcerating Harman without probable cause, which deprived him of his rights under the Fourth and Fourteenth Amendments.  The parties do not dispute that Losat was acting within his discretionary authority.  Therefore, the Court will consider only whether Harman has shown that qualified immunity is not appropriate.

"A warrantless arrest without probable cause violates the Constitution and forms the basis for a section 1983 claim." *Lomax v. Diaz*, 2010 U.S. App. LEXIS 16223 at *4 (11th Cir. Fla. Aug. 3, 2010) (quoting *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. Fla. 1990)).  However, if the arrest is supported by probable cause, the plaintiff is barred from bringing a § 1983 claim for false arrest.  *Id.*

Probable cause exists when the arrest is objectively reasonable based on the totality of the circumstances.  *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002).  "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Id.* (*citing Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. Fla. 1998) (internal quotations omitted)).  It requires more than mere suspicion, but less than convincing proof.  *Mills v. Town of Davie*, 48 F. Supp. 2d 1378, 1380 (S.D. Fla. 1999).

Even if the officer did not have actual probable cause, qualified immunity protection requires only that the officer had arguable probable cause.  *Lee,* 284 F.3d at 1195.  "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest.  *Id.* (quoting *Scarbrough*, 245 F.3d 1299) (internal quotations omitted).

Considering the totality of the circumstances and the undisputed facts known to Losat at the time of Harman's arrest, the Court concludes that there was actual probable cause to

arrest Harman for second degree murder.[4]   The elements entering into this totality, among other things, are: (1) Harman admitted that he was engaged in a heated argument with Emily Harman; (2) Harman admitted to physically struggling over the gun; (3) Harman admitted that the gun was removed from Emily Harman's mouth, and in spite of his superior strength, the was somehow again placed in her mouth; (4) when asked directly, Harman did not affirmatively deny that he was the one who pulled the trigger; (5) Harman was physically larger and heavier than Emily Harman; (6) Harman's criminal history report included an earlier arrest for assault with a weapon and battery; and (7) Losat's supervisor, the assistant state attorney, and the investigator from the State Attorney's Office agreed that there was probable cause when confronted with these facts.

In response, Harman asserts that Losat's sole basis for probable cause is Harman's purported "confession" during the recorded interview that he pulled the trigger of the gun. Harman argues that this purported confession/admission is not a confession at all because he never affirmatively stated that he did pull the trigger, so there was no basis for probable cause.   However, it is evident from the record that there were many factors that created probable cause.   And, as noted before, the question before the Court is not what facts Losat relied on when making the probable cause determination.   Rather, the question is whether a

───────────────

[4]   "The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree..."  Fla. Stat. § 782.04.

reasonably prudent person, given the information within Losat's knowledge at the time, would believe that Harman probably committed second degree murder.

**B.      § 1983 Claim Against Gee**

In Count Five, Harman alleges a cause of action against Defendant Sheriff David Gee under 42 U.S.C. § 1983, alleging that Gee, through the HCSO, violated his Fourth and Fourteenth Amendment rights because Harman was arrested and incarcerated without probable cause that he committed a crime. He further claims that Gee has a "policy, custom, and practice in place whereby persons, like Plaintiff Harman, are arrested and incarcerated without probable cause."

"For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents," *see Owens v. Fulton County*, 877 F.2d 947, 951 n.5 (11th Cir. 1989), here Hillsborough County. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Jones v. Cannon*, 174 F.3d 1271, 1293 n. 15 (11th Cir. 1999). "A governmental entity is not liable under [§] 1983, merely as a matter of respondeat superior, for constitutional injuries inflicted by its employees." *See Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999) (citation omitted). A local government is, however, liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978) (holding that liability of municipalities and other governmental entities under § 1983 is limited to instances of official policy or custom).

To attribute liability to Defendant Gee in his official capacity under § 1983, Plaintiff must demonstrate that Defendant Gee had an official policy or custom that was "the moving force of the constitutional violation." *Vineyard v. County of Murray, Ga.*, 990 F.2d 1207, 1211 (1993) (quoting *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)).  Here, there was no constitutional violation because there was probable cause to arrest Harman.  So there can be no official policy or custom that led to such a violation.

## II.     Harman's State Law Claims

In Counts One and Two, Harman alleges claims against each defendant for false arrest and imprisonment.  In Florida, false arrest and imprisonment is the unlawful restraint of a person against his will.  *Johnson v. Weiner*, 155 Fla. 169, 19 So. 2d 699 (Fla. 1944).  The existence of probable cause bars a claim for false arrest.  *Mills v. Town of Davie*, 48 F. Supp. 2d 1378, 1380 (S.D. Fla. 1999).  In Counts Three and Four, Harman brings claims for malicious prosecution against each defendant.  "A claim for malicious prosecution requires the plaintiff to prove the following: (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant against plaintiff who was defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; (6) damages resulting to plaintiff."  *In re Stamos*, 2010 U.S. Dist. LEXIS 75941 (S.D. Fla. July 28, 2010) (citing *Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217, 1218 (Fla. 1986)).  A showing of actual probable cause for the arrest by Defendants would prevent Harman from being able to satisfy the fourth element.  Because the Court has

already determined that there was probable cause for Harman's arrest, summary judgment must be granted on Counts One through Four.

It is therefore ORDERED AND ADJUDGED that:

1.     Defendant Francis Losat's Motion for Summary Judgment (Dkt. 22) is **GRANTED**.

2.     Defendant David Gee's Motion for Summary Judgment (Dkt. 26) is **GRANTED**.

3.     The Clerk is directed to enter summary final judgment in favor of Defendants Detective Francis Losat and David Gee and against Plaintiff Charles Paul Harman.

4.     The Clerk is further directed to terminate any pending motions and close this case.

**DONE** and **ORDERED** in Tampa, Florida on September 10, 2010.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>**Copies furnished to:**</u>
Counsel/Parties of Record

S:\Odd\2009\09-cv-1205.msjs 22, 26.frm